IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| IN RE: APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH WARRANT AND ORDERS PURSUANT TO 18 U.S.C. §§ 2703(C)(1)(A) AND 3122(A)(1) FOR THE<br><br>(1) DISCLOSURE OF PROSPECTIVE CELL-SITE DATA;<br><br>(2) DISCLOSURE OF STORED TELECOMMUNICATIONS RECORDS; AND<br><br>(3) INSTALLATION OF A PEN REGISTER/TRAP AND TRACE DEVICE<br><br>ON (407) 508-7657 | No. 3:23-sw-103 |

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

I, Daniel Cayton, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an Application for a Search Warrant under 18 U.S.C. §§ 2703(c)(1)(A) for information associated with a cellular device assigned with the telephone number (407) 508-7657 ("SUBJECT TELEPHONE NUMBER"), which is serviced by T-Mobile ("TELEPHONE SERVICE PROVIDER") and has a listed subscriber of Semaen Cyrus. As a provider of wireless communications service, the TELEPHONE SERVICE PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2. Because this warrant seeks the prospective collection of information, including cell site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4) ("pen/trap device"),

the requested warrant is designed also to comply with the Pen Register Act, *see* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. The information to be searched is described in the following paragraphs and in Attachment A. This Affidavit is made in support of an Application for a Search Warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the TELEPHONE SERVICE PROVIDER to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

4. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since May 2015. As a Special Agent with the DEA, I have received specialized training in narcotics trafficking. During my assignment with the DEA, I have participated in the execution of state and federal search warrants related to controlled substances. I have conducted investigations into the unlawful possession, possession with the intent to distribute, and importation and distribution of controlled substances, and their associated conspiracies in violation of Title 21, U.S.C. §§ 846 and 841(a)(1). I am currently assigned to the DEA Richmond District Office (DO) of the Washington Field Division. I am responsible specifically for investigating crimes that involve the trafficking and distribution of controlled substances.

5. Before coming to the DEA RDO, I was assigned to the DEA Yuma Resident Office (YRO) in Yuma, Arizona. While there, I was responsible for investigating crimes that involved the unlawful importation of illegal drugs and the unlawful exportation of proceeds and goods derived from the sale of illegal drugs. DEA YRO conducts narcotics investigations and specializes

in the detection, penetration, and dismantling of Mexican drug trafficking organizations (DTO's), often in coordination with the Federal Bureau of Investigation; the United States Immigration and Customs Enforcement/Homeland Security Investigations; the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the United States Border Patrol; Customs and Border Protection; and state/local law enforcement personnel designated as Task Force Officers.

6. I am familiar with the methods traffickers use to conduct their illegal activities, to include communication methods, asset management, and narcotics transactions. In addition, I have received training in asset forfeiture, money laundering, and asset identification of drug traffickers.

7. By virtue of my employment as a Special Agent, I have performed various tasks, which include, but are not limited to:

 a. Functioning as a surveillance agent, thus observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs;

 b. Interviewing confidential sources (CS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments);

 c. Compiling and interpreting information from various data sources in order to further develop evidence of the communications, associates, locations, timing, and movements involved in the trafficking of illegal drugs;

 d. Functioning as a co-case agent of the current investigation as well as the case agent and co-case agent of other investigations, which have involved the trafficking of drugs and the laundering of monetary instruments; and

    e. Functioning as an affiant in federal court-authorized wiretap investigations.

  8. The facts in this Affidavit come from my training and experience, my review of documents, and information obtained from other agents. This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

  9. Based on the facts set forth in this Affidavit, there is probable cause to believe that criminal violations of 21 U.S.C. §§ 841 (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances have been committed, are being committed, and will be committed by first name unknown last name unknown (FNU LNU) a.k.a. "WILLY." There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

  10. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

  11. The United States, including the Drug Enforcement Administration, is conducting a criminal investigation of FNU LNU a.k.a. WILLY (an unidentified subject) regarding possible violations of 21 U.S.C. §§ 841 (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances.

### Background

12. Since 2022, members of the DEA Chattanooga Resident Office (RO) have been investigating the drug trafficking activities of Jaime **JAUREGUI**. Through the course of their investigation, **JAUREGUI** has been identified as a poly-drug source of supply (SOS) residing in Mexico using a United States-based cellular telephone number (407) 963-4030.

### Activation of JAUREGUI Target Telephone

13. Through the course of their investigation, members of the DEA Chattanooga RO obtained authorization to intercept **JAUREGUI**'s line, (407) 963-4030. Specifically, on June 1, 2023, the Honorable Travis R. McDonough, United States District Judge of the Eastern District of Tennessee, authorized the interception of wire and electronic communications of **JAUREGUI's** telephone number (407) 963-4030.

### June 15, 2023, Intercepted Communications with WILLY Using (407) 963-4030

14. On June 15, 2023, at approximately 9:54 p.m., **JAUREGUI**, using (407) 963-4030, contacted a yet-unidentified individual who used the moniker "**WILLY**" using telephone number (407) 600-2343 requesting that **WILLY** travel to Richmond, Virginia, to oversee a drug transaction. During this intercept **JAUREGUI** and **WILLY** were heard saying the following:

> **WILLY**: Hello
>
> **JAUREGUI**: Hey how you doing Willy?
>
> **WILLY**: Good, how are you doing man?
>
> **JAUREGUI**: I'm alright, I am doing alright, just been a little stressed lately, diabetic, high blood pressure.
>
> **WILLY**: Ohh ok, diabetic, high blood pressure dangerous, you know?
>
> **JAUREGUI**: Yea, I have been having really high blood pressure from a lot of stress right now.

**WILLY**: Yea, ok, ok, because of everybody right now.

**JAUREGUI**: Yea everybody is good, I have been trying to send one over there to umm, to umm the ranch right there, where you go, I just haven't been able to send it yet because the only person that's helping me right there is my son and I don't really like to get him involved.

**WILLY**: Ohh ok.

**JAUREGUI**: So it's been really hard to see how I am going to do it or whatever, unless I send it to my Mom's, my Mom is going to (unfinished thought).

**WILLY**: Ohh ok, so umm CANDY was saying something about some driving or something like that.

**JAUREGUI**: Yea I am trying to see if I can get somebody to drive, to different states and stuff, move some stuff around, I got West Virginia, New York, umm even if you don't drive, just to be over there and make sure people are doing stuff, I need eyes and stuff.

**WILLY**: Yea I am with you, I am in for that right now, you know?

**JAUREGUI**: Your driving?

**WILLY**: Yea, I'm in for that, you know, everything is everything straight up with everything, I'm in for that.

**JAUREGUI**: You're in for it?

**WILLY**: Yea!

**JAUREGUI**: Alright, well let me see if I can get you on our first mission, maybe in a West Vir, I mean in Richmond, Virginia.

**WILLY**: Yea

**JAUREGUI**: Or North Carolina, one of them two I think first.

**WILLY**: Ok then just let me know, I am ready for that Nerd anytime.

**JAUREGUI**: Alright, yea we can do that, but I mean I don't what the numbers, the prices are all different from before.

**WILLY**: Ok, ok.

6

**JAUREGUI:** You remember from before that everything was real good now everything is so cheap, and everything is messed up.

**WILLY:** Yea, because it keeps going up, down, up, down, up, down, you know?

**JAUREGUI:** Yea, I gotta try to figure out a good way to where we are all happy, you know?

**WILLY:** Yea, yea, yea.

**JAUREGUI:** I got some dudes right now in North Carolina that I am sending stuff to Richmond Virginia and uhh maybe you can show up there and just hang out with them until they get the work done and don't give them anything until they bring you the money.

**WILLY:** Yea, yea, I am in for that.

**JAUREGUI:** Alright, yea let me get a little more information and everything and I will let you know how we can do it.

**WILLY:** Alright, alright just let me know.

**JAUREGUI:** Alright, you take care man, I'll let you know, say bye to CANDY for me.

**WILLY:** Hold on for a minute.

*CANDY gets back on the phone*

JAUREGUI told CANDY he just wanted to tell her bye and that he hopes everything turns out alright. CANDY said to hold on, Willy wants to say something.

*Willy gets back on the phone*

**WILLY:** Hello.

**JAUREGUI:** Hey.

**WILLY:** Yea where in North Carolina exactly?

**JAUREGUI:** Yea a couple different places in North Carolina.

**WILLY:** Ok, because I have people over there in... (cut off by JJ).

**JAUREGUI:** There's Jonesboro, Wilson, Raleigh, Durham, Greensboro, there is a bunch of places.

7

**WILLY**: I still have people there in Greensboro, I used to be over there.

15. Based on the content of this conversation, in my training and experience, and what I have learned from other law enforcement officers, I believe that in this intercepted communication, **JAUREGUI** contacted telephone number (407) 600-2343 used by a yet-unidentified female who used the moniker "CANDY." During the intercept, **JAUREGUI** asked **CANDY** to give the phone to **WILLY**. Then, while speaking to **WILLY**, **JAUREGUI** directed **WILLY** to travel to Richmond, Virginia, to oversee the exchange of drugs for money.

16. Specifically, when **JAUREGUI** said, "Yea everybody is good, I have been trying to send one over there to umm, to umm the ranch right there, where you go, I just haven't been able to send it yet because the only person that's helping me right there is my son and I don't really like to get him involved," I believe in this portion of the intercepted communication that when **JAUREGUI** told **WILLY** that he was trying to send "them" "to the ranch" **JAUREGUI** was telling **WILLY** that he was sending drugs to an unspecified destination. I know based on training and experience that drug traffickers often use vague and cryptic terminology when describing drugs and their illicit activities as a means to insulate themselves from law enforcement intervention.

17. As the intercept continued, when **WILLY** said, "Ohh ok, so umm CANDY was saying something about some driving or something like that" **WILLY** asked if **JAUREGUI** wanted **WILLY** to drive drugs. **JAUREGUI** responded, "Yea I am trying to see if I can get somebody to drive, to different states and stuff, move some stuff around, I got West Virginia, New York, umm even if you don't drive, just to be over there and make sure people are doing stuff, I need eyes and stuff"; **JAUREGUI** advised **WILLY** that he (**JAUREGUI**) needed someone to drive and/or deliver drugs to customers specified in West Virginia, and New York. Further, when **JAUREGUI**

said "I need eyes and stuff" **JAUREGUI** told **WILLY** he (**JAUREGUI**) needed someone to act as **JAUREGUI's** representative in the United States to oversee these drug transactions.

18. As the intercept continued **JAUREGUI** stated, *"Alright, well let me see if I can get you on our first mission, maybe in a West Vir, I mean in Richmond, Virginia."* Based upon my training and experience, and understanding of this investigation, **JAUREGUI** told **WILLY** to travel to Richmond, Virginia, to oversee a delivery of drugs. Later, when **JAUREGUI** said, *"I got some dudes right now in North Carolina that I am sending stuff to Richmond Virginia and uhh maybe you can show up there and just hang out with them until they get the work done and don't give them anything until they bring you the money,"* **JAUREGUI** told **WILLY** not to front any drugs to the customer in Richmond, Virginia, and to ensure that **WILLY** received cash upon delivery of those drugs.

**Identification of the TARGET TELEPHONE NUMBER**

19. On June 15, 2023, at approximately 10:32 p.m., **JAUREGUI**, using (407) 963-4030, called **WILLY**, who was using the TARGET TELEPHONE NUMBER. During this intercept **JAUREGUI** and **WILLY** were heard saying the following:

**WILLY**: Hello

**JAUREGUI**: Hey Willy

**WILLY**: Yea I was telling Candice that I just called by mistake, I texted though.

**JAUREGUI**: Oh ok, yea

**WILLY**: Yea I wasn't trying to text you but umm

**JAUREGUI**: Yea I got it, that's a good one right there?

**WILLY**: Yea that's a good one.

**JAUREGUI**: Ok

**WILLY**: Alright

JAUREGUI: Alright, bye

WILLY: Alright

20. Based on the content of this conversation, in my training and experience, and what I have learned from other law enforcement officers, I believe that in this intercepted communication, **WILLY** was using the TARGET TELEPHONE NUMBER and advised that he called **JAUREGUI** accidentally. As such, I believe this indicates that **WILLY** was in possession of the TARGET TELEPHONE NUMBER.

### June 15, 2023, Text Message Exchange Between WILLY and JAUREGUI

21. Following the above-described intercepted communications, **JAUREGUI**, using telephone number (407) 963-4030 and **WILLY**, using the TARGET TELEPHONE NUMBER, exchanged text messages. That exchange in detailed below:

WILLY: I have a adress if you want to use it (sic)

WILLY: Sandra Smith 901-A Rachna lane Kissimmee 34741

JAUREGUI: Alright, good

WILLY: Bless

JAUREGUI: Bless

22. Based on the content of this conversation, in my training and experience, and what I have learned from other law enforcement officers, I believe that in this intercepted communication, **WILLY** using the TARGET TELEPHONE NUMBER, provided **JAUREGUI** with an address used by **WILLY**.

### Administrative Subpoena for the TARGET TELEPHONE NUMBER

23. Following the intercepted communications, members of the DEA Chattanooga RO served T-MOBILE with an administrative subpoena requesting subscriber and toll records for the

TARGET TELEPHONE NUMBER. T-MOBILE records indicate the subscriber of the account was Semaen Cyrus to the address 901 Rachna Lane Apartment A, Kissimmee, Florida, 34741. It should be noted that this is the same address which was provided by **WILLY** using the TARGET TELEPHONE NUMBER to **JAUREGUI**. Records provided by T-MOBILE indicate that the TARGET TELEPHONE NUMBER was activated on January 28, 2005.

### Conclusion

24. Based upon facts and circumstances described in this Affidavit, I believe that **WILLY** has been recruited by **JAUREGUI** do one of two things. **WILLY** has been instructed to either to travel to Richmond, Virginia, in order to transport a load of drugs and receive payment for those drugs, or oversee the delivery of drugs and ensure that payment for those drugs is received by **JAUREGUI**. As such, the location data of the TARGET TELEPHONE NUMBER used by **WILLY** will be necessary to attempt to identify when a load of drugs is due to arrive in Richmond, Virginia, and further lead to the identification of **WILLY**.

25. In my training and experience, I have learned that the TELEPHONE SERVICE PROVIDER is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell site data, also known as "tower/face information" or "cell tower/sector records." Cell site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to

or from that device. Accordingly, cell site data provides an approximate general location of the cellular device.

26. Based on my training and experience, I know that the TELEPHONE SERVICE PROVIDER can collect cell site data on a prospective basis about the SUBJECT TELEPHONE ACCOUNT. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.

27. I also know that wireless providers such as the TELEPHONE SERVICE PROVIDER typically collect and retain cell site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

28. Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen/trap devices and indicate the identity of the cellular device making the communication

without revealing the communication's content. Currently, the SUBJECT TELEPHONE device can be identified by IMEI 352457101118570.

29. Based on my training and experience, I know that wireless providers such as the TELEPHONE SERVICE PROVIDER typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the TELEPHONE SERVICE PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT ACCOUNT's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

30. Based on the foregoing, I request that the Court issue the proposed Search Warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

31. I further request that the Court direct the TELEPHONE SERVICE PROVIDER to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the TELEPHONE SERVICE PROVIDER. I also request that the Court direct the TELEPHONE SERVICE PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with services of the TELEPHONE SERVICE PROVIDER, including by initiating a signal to determine

the location of the SUBJECT TELEPHONE NUMBER on the network of the TELEPHONE SERVICE PROVIDER or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the TELEPHONE SERVICE PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

Respectfully submitted,

_____
Special Agent Daniel Cayton
Drug Enforcement Administration

Sworn and subscribed to before me on
____June 21, 2023_____ .

_____/s/ SLS_____
Hon. Summer L. Speight
United States Magistrate Judge

14

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This Warrant applies to records and information associated with the cellular telephone assigned call number (407) 508-7657 with International Mobile Equipment Identity 352457101118570 ("SUBJECT ACCOUNT"), that are stored at premises controlled by T-Mobile ("PROVIDER"), headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

## **ATTACHMENT B**

PARTICULAR THINGS TO BE SEIZED

I. **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the Account listed in Attachment A ("SUBJECT ACCOUNT"):

A. **The following information about the customers or subscribers associated with the SUBJECT ACCOUNT for the time period of sixty (60) days preceding the date the Warrant is executed up to the present:**

1. Names (including subscriber names, user names, and screen names);
2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
3. Local and long distance telephone connection records;
4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
5. Length of service (including start date) and types of service utilized;
6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
7. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and
8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

B. **The following historical stored telecommunications records associated with the SUBJECT ACCOUNT for the time period of sixty (60) days preceding the date the Warrant is executed up to the present:**

1. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT ACCOUNT, including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received

C. **The following prospective cell-site data associated with the SUBJECT ACCOUNT for the time period of 30 days from the date of the Warrant (or the date the monitoring of the SUBJECT ACCOUNT device's location becomes operational, whichever is later:**

1. Information associated with each communication to and from the SUBJECT ACCOUNT for a period of 30 days from the date of the Warrant or the date the monitoring equipment for the device's location becomes operational, whichever is later, including:

   a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   b. Source and destination telephone numbers;

   c. Date, time, and duration of communication; and

   d. All data about the cell towers (*i.e.* antenna towers covering specific geographic areas) and sectors (*i.e.* faces of the towers) to which the SUBJECT ACCOUNT will connect at the beginning and end of each communication

II. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

All information described above in Section I that constitutes evidence, instrumentalities, contraband, or fruits of violations of 21 U.S.C. §§ 841 (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances involving FNU LNU during the period for thirty days preceding the date of this order.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the PROVIDER in order to locate the things particularly described in this Warrant.